

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00321-CV

———————————————

AUSTEN CONSULTANTS, LLC, Appellant

V.

SPARK I/T SERVICES, LLC; SPARK SERVICES, LLC; AND GREGORY D.
STEINIG, Appellees

———————————————

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-351798-24

———————————————

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

Appellant Austen Consultants, LLC, in two issues, appeals the trial court's grant of a traditional and no-evidence summary judgment as to all of its claims against Appellees Spark I/T Services, LLC and Gregory Steinig[1] and the trial court's attorney's fee award to them as prevailing parties under the Texas Theft Liability Act. We will affirm.

## I.    BACKGROUND

This appeal arises initially from an alleged breach of a contract, titled "Confidentiality, Non-disclosure, Non-solicitation and Non-compete Agreement," between Austen and Steinig (the "Steinig Agreement"). The Steinig Agreement includes several clauses, including, relevant here, a nondisclosure clause.

### A.    Underlying Dispute

Austen and Spark are both telecommunications and information technology companies. Both are customers of 3CX, a company which provides software and network services to allow organizations to operate telephone systems using Voice Over Internet Protocol (VOIP) services. 3CX sells licenses to resellers like Austen and Spark,

---

[1]Although Austen's petition listed both Spark I/T Services, LLC and Spark Services, LLC, Austen served only the former and Steinig. Spark I/T Services, LLC and Steinig (hereinafter collectively referred to as Appellees) answered only on behalf of the two served parties. The parties do not challenge the finality of the judgment and Austen did not indicate an intent to serve additional parties. Based upon this record, the judgment is regarded as final for purposes of appeal. *See M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 674–75 (Tex. 2004); *Youngstown Sheet & Tube Co. v. Penn*, 363 S.W.2d 230, 232 (Tex. 1962).

and it maintains a public-facing website that lists 3CX pricing data and links to the resellers' web pages arranged in tiers based on sales volume and geographic location. Both Austen and Spark are listed on the public website as resellers of 3CX's service. Austen's customer base generally includes schools and governmental entities.

Steinig was a vice-president of sales for 3CX for five years. As a 3CX employee, he had information about resellers and their customers, including about Austen and its customers. Steinig ended his employment with 3CX in November 2022. Austen then hired him in a sales capacity.

Austen's Chief Intelligence Officer, Matt Ussery, specifically recruited and hired Steinig because of the professional contacts and experience he had gained through working for 3CX, including information about Austen's 3CX customers. In February 2023, Steinig executed new-employee documentation, including the Steinig Agreement.[2]

During Steinig's tenure at Austen, Austen entered into a referral agreement with AMCOM, a provider of services and equipment related to AT&T VOIP telephone service. Also in 2023, Austen began providing its own VOIP telephone service and marketing it as Austen Consultants Switch (ACS).[3] During his employment with

---

[2]Steinig worked for Austen from November 2022 until February 2023 before he executed his new-employee paperwork, including the Steinig Agreement.

[3]In February 2024, Austen also began branding its proprietary VOIP services as AustenTel.

Austen, Steinig was unimpressed with ACS as a service and felt Austen was "pushing people into a product that [didn't] work."

Steinig worked for Austen until September 2023. A few weeks before his employment ended, Austen provided Steinig with a company-owned laptop to use. Austen contends that Steinig made no sales and recruited no customers during his tenure at Austen. After his employment with Austen ended, Steinig began working for Spark and, shortly thereafter, formed a vendor relationship with AMCOM.

In January 2024, hackers used ransomware to lock Austen out of its computer systems. The attack deprived Austen's customers of telephone service for six to seven days.

On February 1, 2024, Steinig emailed several Austen customers stating that he had heard from others that ACS may be down and offered to assist those who intended to find service elsewhere. With the emails, Steinig intended to solicit the customers' business for Spark.

One Austen customer, Grapevine Faith Christian School, called Spark to request a quote for service. After the call, Grapevine Faith terminated its service with Austen.[4]

## B.    Lawsuit

On April 9, 2024, Austen sued Appellees, alleging breach of the Steinig Agreement, common law misappropriation of trade secrets, statutory misappropriation

---

[4]According to Ussery, at the time of his deposition, Grapevine Faith still owed the balance of its contractual payments to Austen.

of trade secrets, and tortious interference with the Steinig Agreement, and sought attorney's fees and temporary and permanent injunctions. The trial court granted a temporary injunction.

Around April 2024, one of Austen's customers, Beaumont Independent School District (BISD), solicited Spark for a quote for service. BISD had purchased and prepaid for several years of service from Austen. A receptionist transferred the call to Steinig. Steinig spoke to the representative, informed him that Steinig could not help with BISD's 3CX issues, and then sent the recording to Spark's owner and to its attorney. Steinig became aware later that BISD chose to purchase service from Spark, but he did not know the details and did not otherwise participate in the sale.

It is Austen's business practice to lease, rather than sell, 3CX licenses to clients. BISD changed the designated partner listed with 3CX to manage the license that it had leased from Austen so that Spark could provide the service. Spark later sold BISD a new license. Austen claims that it was damaged by BISD's changing the provider name on its license, although BISD did not terminate its contract with Austen and had prepaid the entire amount due, which, at the time of Ussery's deposition, Austen had not refunded or returned.

In October 2024, Austen amended its pleadings to allege causes of action for conversion, civil conspiracy, and violation of the Texas Theft Liability Act (TTLA).[5]

---

[5] *See* Tex. Civ. Prac. & Rem. Code § 134.001.

Austen alleged that Steinig had wiped the memory of and "factory reset" the laptop it sent him in November 2023 and that he or Spark had changed the status of the BISD 3CX license.

During discovery, the parties deposed Steinig and representatives from both Austen and BISD. Steinig testified that Austen's sales were conducted through public bidding processes and so the price structures were public, nonconfidential information. Steinig stated that he knew "what [Austen] charged before [he] ever went to work for [Austen]." He knew of Austen's vendors and vendor relationships while he was still employed with 3CX. He stated that the vendor relationships did not dictate how resellers did business and that there was no "secret sauce" in selecting and dealing with vendors other than 3CX. He also testified that he did not receive any information from Austen that he understood was not public knowledge.

## C. Summary Judgment

After the close of discovery, Appellees filed a traditional and no-evidence motion for summary judgment. They argued that the Steinig Agreement was unenforceable as a matter of law, that the evidence conclusively showed that Austen had suffered no harm, that common law misappropriation of trade secrets was not a viable cause of action, that Spark could not be held liable for tortious interference with the Steinig Agreement, and that no evidence supported at least one element of each of Austen's claims.

Austen filed a response to Appellees' motion. Austen attached seven exhibits to the response: Ussery's unsworn declaration as Austen's managing member; Steinig's new-employee paperwork, including the Steinig Agreement; an audio recording of a telephone call between Ussery and Steinig;[6] a transcript of Steinig's deposition; copies of emails from Steinig to several of Austen's customers asking if they "need help" due to their "phones being down"; a partially executed agreement between Austen and The Key School; and a quote for service and partially executed customer agreement between Austen and Grapevine Faith.

During the hearing on the motion, Austen nonsuited four of its claims: breach of the Steinig Agreement's covenant not to compete, common law misappropriation of trade secrets, civil conspiracy, and conversion. Upon Appellees' objection, the trial court excluded portions of Ussery's unsworn declaration pertaining to the reasons why BISD modified the 3CX license it leased from Austen, the identity of the person who modified it, and that Spark had caused the transfer of that 3CX license to itself.[7] And the trial court considered and granted summary judgment on the remaining four claims: breach of the Steinig Agreement's confidentiality clause, statutory misappropriation of trade secrets, tortious interference with contract, and violation of the TTLA.

---

[6]The audio was not included in the record.

[7]Austen does not challenge the exclusion of the evidence on appeal.

**D.  Attorney's Fees**

Thereafter, Appellees filed a motion for attorney's fees as the prevailing party under the TTLA.[8] After considering an affidavit and expert testimony of Appellees' attorney, the trial court awarded them $22,120 in attorney's fees and costs.

Austen now appeals the order granting summary judgment and the order awarding attorney's fees.

## II.  SUMMARY JUDGMENT

Austen argues in two issues[9] that the trial court erred in granting Appellees' motion for summary judgment and motion for attorney's fees.

**A.  Standard of Review**

We review de novo a trial court's ruling on a summary judgment motion. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The trial court's order in this case granted Appellees' traditional and no-evidence motion for summary judgment. When the trial court's order does not specify the ground or grounds relied upon for its ruling, we must affirm if any of the theories advanced by the movant

---

[8]*See id.* § 134.005(b) ("Each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees.").

[9]Austen's allegation of error in the trial court's order granting summary judgment is divided into three sub-parts—whether the no-evidence motion was sufficiently specific to provide notice, whether genuine issues of material fact exist that would preclude summary judgment, and whether judgment as a matter of law was appropriate as to Austen's breach of contract, tortious interference, Texas Uniform Trade Secrets Act ("TUTSA"), and TTLA claims—which we will address as a single issue.

8

have merit. *Cunningham v. Zurich Am. Ins. Co.*, 352 S.W.3d 519, 524 (Tex. App.—Fort Worth 2011, pet. denied) (citing *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)).

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that no evidence supports an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i).[10] The motion must specifically state the elements for which no evidence exists. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). A properly filed no-evidence motion shifts the burden to the nonmovant to present evidence raising a genuine fact issue supporting each element contested in the motion. *Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*, 663 S.W.3d 569, 576 (Tex. 2023); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the nonmovant fails to meet its burden under the no-evidence motion, there is no need to address the challenge to the traditional motion as it necessarily fails. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

However, if the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary

---

[10]The supreme court recently amended Rule 166a, but the amendments apply only to a motion for summary judgment filed on or after March 1, 2026. Sup. Ct. of Tex., Final Approval of Amendments to Rule 166a of the Texas Rules of Civil Procedure, Misc. Docket No. 26-9012 (Feb. 27, 2026). The summary judgment motion in this case was filed before the effective date of the amendments, so the pre-amendment version of Rule 166a applies in this appeal. All citations in this opinion to Rule 166a are to the version of the rule that existed prior to March 1, 2026.

judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). In that case, we then consider the traditional motion for summary judgment.

A defendant is entitled to a traditional summary judgment if it conclusively negates at least one essential element of the plaintiff's cause of action, showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Hillis v. McCall*, 602 S.W.3d 436, 439–40 (Tex. 2020); *Harkins v. Wal-Mart Stores Tex., LLC*, No. 02-21-00201-CV, 2022 WL 3453548, at *4 (Tex. App.—Fort Worth Aug. 18, 2022, pet. denied) (on reh'g).

## B.    Specificity of the Motion

In its brief, Austen argues that Appellees' no-evidence motion for summary judgment was facially deficient because Austen cannot discern which element or elements are challenged as to each cause of action.

A no-evidence motion for summary judgment "must state the elements as to which there is no evidence." Tex. R. Civ. P. 166a(i). The 1997 comments to Rule 166a, which are "intended to inform the construction and application of the rule," state: "The motion must be specific in challenging the evidentiary support for an element of a claim or defense; paragraph (i) does not authorize conclusory motions or general no-evidence challenges to an opponent's case." *See* Tex. R. Civ. P. 166a 1997 cmt. If a no-evidence motion for summary judgment is not specific in challenging a particular element or is conclusory, the motion is legally insufficient as a matter of law and may be challenged

for the first time on appeal. *See Luna v. Garcia*, No. 02-23-00209-CV, 2023 WL 7400927, at \*2 & n.5 (Tex. App.—Fort Worth Nov. 9, 2023, pet. denied).

While a party may challenge more than one element of a cause of action in a no-evidence motion, it may not do so by merely listing each element and stating that the plaintiff has no evidence to support "one or more," or "any of" those elements because such language "does not clearly identify which elements, whether some or all, are challenged." *See Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 695–96 (Tex. 2017). However, a party can contest a single element, several elements, or every element of an opponent's case, so long as each element is distinctly and explicitly challenged. *See Martin v. McDonnold*, 247 S.W.3d 224, 233 (Tex. App.—El Paso 2006, no pet.).

We note that Austen's appellate brief alleges that Appellees' no-evidence motion for summary judgment lacked specificity as to the elements of conversion and civil conspiracy challenged. However, Austen stipulated to nonsuit these claims in the trial court, along with its claims for common law misappropriation of trade secrets and breach of the Steinig Agreement's non-compete clauses. The trial court granted the nonsuit. A party cannot complain on appeal that the trial court took a specific action that the complaining party requested. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) (quoting *Ne. Tex. Motor Lines v. Hodges*, 158 S.W.2d 487, 488 (Tex. [Comm'n Op.] 1942)). As this court has previously held, when a party affirmatively requests nonsuit of its claims, that party cannot then challenge the trial court's dismissal of such

claims. *See Swain v. Hutson*, No. 02-09-038-CV, 2009 WL 3246750, at *6 (Tex. App.—Fort Worth Oct. 8, 2009, pet. denied).

## C. Summary Judgment

Austen argues that the trial court erred when it granted Appellees' no-evidence motion for summary judgment as to its four outstanding claims. We will address Austen's issue as it applies to each.

### 1. Breach of Contract

The elements of a breach of contact claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) material breach of the contract by the defendant, and (4) resulting damages to the plaintiff. *See Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.). As stated herein, Appellees challenged the third and fourth elements—breach and damages.

Appellees' no-evidence motion alleges that there "is no evidence to support that [Steinig] materially breached any contract. Alternatively, there is no evidence that any such breach caused [Austen] any damages." Austen alleges that the use of the term "alternatively" renders the pleading unintelligible and the challenged elements opaque.

However, it is clear from the language of the motion that Appellees allege there is no evidence to support the two elements listed: material breach of a contract by Steinig and resulting damages. *See State v. Three Thousand, Seven Hundred Seventy-Four Dollars & Twenty-Eight Cents U.S. Currency*, 713 S.W.3d 381, 388 (Tex. 2025); *Frolamo,*

*LLC v. Ortega*, No. 13-23-00210-CV, 2025 WL 1387070, at *8 (Tex. App.—Corpus Christi–Edinburg May 13, 2025, no pet.).

Austen introduced the Steinig Agreement as evidence of its contract with Steinig and Steinig's emails to Austen's customers in contravention of the terms of the Steinig Agreement as evidence of material breach.[11]

Generally, materiality is an issue to be determined by the trier of facts. *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983). Like other issues of fact, materiality may be decided as a matter of law only if reasonable jurors could reach only one verdict. *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). Presuming an email constitutes "interference" with a customer, Austen raised a genuine issue of material fact as to the element of material breach.

However, Austen's evidence as to resulting damages consists of a reference to a conclusory statement in Ussery's unsworn declaration that the trial court, on Appellees' motion, excluded from the record as inadmissible for lack of personal knowledge. Because Austen does not challenge that ruling on appeal, we cannot consider the statement as summary judgment evidence. *See* Tex. R. Evid. 602; *Bolanos v. Purple Goat, LLC*, 649 S.W.3d 753, 763–64 (Tex. App.—El Paso 2022, no pet.); *All Am. Tel., Inc. v.*

---

[11]In its response to the motion for summary judgment, Austen acknowledged that both the confidentiality and non-solicitation provisions of the Steinig Agreement were challenged, but it only presented evidence related to the enforceability and the breach of the non-compete provision.

*USLD Commc'ns, Inc.*, 291 S.W.3d 518, 526 n.23 (Tex. App.—Fort Worth 2009, pet. denied) (stating that when an evidentiary ruling on summary judgment evidence has not been challenged on appeal, the appellate court cannot consider the excluded evidence). Austen presented no proper evidence as to this element. *See* Tex. R. Civ. P. 166a(f) (requiring affidavit or declaration opposing a no-evidence motion to "set forth such facts as would be admissible in evidence."); *Frazier v. Khai Loong Yu*, 987 S.W.2d 607, 610 (Tex. App.—Fort Worth 1999, pet. denied), *abrogated on other grounds by Seim v. Allstate Tex. Lloyds*, 551 S.W.3d 161 (Tex. 2018).

Because Austen did not offer admissible evidence as to at least one challenged element of breach of contract, the trial court properly granted summary judgment.

### 2.    Statutory Misappropriation of Trade Secrets

The elements of statutory misappropriation of trade secrets under TUTSA are (1) ownership of a trade secret, (2) misappropriation of that trade secret, and (3) an injury, if the plaintiff is seeking damages. Tex. Civ. Prac. & Rem. Code §§ 134A.002(1), (3), (6), 134A.004(a); *see BioTE Med., LLC v. Medcalf*, No. 05-20-00661-CV, 2022 WL 18007665, at *13 (Tex. App.—Dallas Dec. 30, 2022, no pet.).

TUTSA's definition of a trade secret includes various kinds of information, provided as follows:

> (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

> (B) the information derives independent value, actual or potential, from not being generally known to, and not being readily ascertainable through

14

proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code § 134A.002(6). When both no-evidence and traditional summary judgment motions are filed, we usually address the no-evidence motion first, *see Ford Motor Co.*, 135 S.W.3d at 600, although we may review the propriety of granting the traditional summary judgment first if it is dispositive of the claim. *See Reynolds v. Murphy*, 188 S.W.3d 252, 258 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g).

In their motion for summary judgment, Appellees state that "[t]here is no evidence that [Austen] owns a trade secret subject to the claim. To qualify as a trade secret, [Austen] [must have] taken reasonable measures under the circumstances to keep the information secret."[12]

To show that the information in question does not meet the statutory definition of a trade secret because Austen made no efforts—much less took any "reasonable

---

[12]Austen argues on appeal that this language is legally deficient, as Austen is "left to guess and present evidence on both elements," referring to the statutory definition of a trade secret as information that (A) its owner has taken "reasonable measures under the circumstances" to keep secret, and (B) has independent economic value from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or use. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6). Although we resolve this issue on other grounds, we note that the language would have been facially sufficient to give Austen notice of the particular element—ownership of a trade secret—challenged and even to the specific part of the definition—whether Austen took reasonable measures under the circumstances to keep the information secret—that was challenged. *See Palliative Plus LLC v. A Assure Hospice, Inc.*, No. 03-23-00770-CV, 2025 WL 284920, at *11 (Tex. App.—Austin Jan. 24, 2025, no pet.). "Financial data" and a "list of actual or potential customers or suppliers" can be a trade secret under TUTSA if the information meets the two statutory conditions. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6).

measures"—to keep the information secret, Appellees showed the following: (1) Austen hired Steinig specifically because he already had information about Austen's actual and potential customer base by dint of his previous employment and had access to Austen's alleged secret information before he was subject to the nondisclosure agreement;[13] (2) Austen's price structure for government and school customers was often subject to public bidding processes and public information laws, and its pricing structure was common to 3CX resellers; (3) Austen did not mark its contracts with its customers as confidential or include confidentiality or nondisclosure agreements as part of the contracts; and (4) Austen required all or most of its employees but not its management[14] to sign nondisclosure agreements.

To its response, Austen attached the following evidence to show it took reasonable measures to keep the information at issue secret: (1) Ussery's unsworn declaration in support of Austen's response which states, without elaboration, that "Austen has developed a manner and means of doing business with school districts, for

[13]Ussery's unsworn declaration states that Steinig signed the Steinig Agreement "[d]uring [his] onboarding on February 6, 2023, Steinig's official date of hire." However, Ussery testified during his deposition that Steinig was employed before that date, that the affidavit "says on or about[, s]o about could be before that," and that December 2022 is "on or about" February 6, 2023.

[14]Neither Ussery nor his ex-wife, who is now uninvolved in Austen's business but remains its CEO, signed such an agreement. Ussery stated that his ex-wife could not have disclosed Austen's confidential information because she transferred her ownership of the business to him as part of their divorce. Ussery also testified that he did not need to sign an agreement because Austen was his company, and it would not function without him.

example, which is innovative"; (2) Steinig's deposition, particularly noting his testimony that he was familiar with nondisclosure agreements and their purposes; (3) emails from Steinig to various companies stating that Spark was "getting calls from many Austen customers about their phones being down and [that Steinig] want[ed] to check to see if [the customer] need[ed] help"; and (4) copies of two customer agreements not designated as "confidential" during this litigation[15] and neither of which provided that the pricing or other information therein is confidential.

Austen's pleadings and brief do not differentiate, and neither does the Steinig Agreement, between information Steinig already possessed while he was employed with 3CX and information he allegedly acquired while working for Austen. Austen acknowledged that it hired him for his existing knowledge of its operations, clients, and services, but does not acknowledge in its agreement that he already possessed such information or whether and to what extent the information alleged to be Austen's trade secrets are the same information Steinig had already rightly acquired before he began his employment. *See Hous. Livestock Show & Rodeo, Inc. v. Dolcefino Commc'ns, LLC*, 702 S.W.3d 675, 697 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (noting that a holder

---

[15] *See Sci. Mach. & Welding, Inc. v. Rose*, No. 03-20-00564-CV, 2022 WL 850409, at *2 (Tex. App.—Austin Mar. 23, 2022, no pet.) (noting that failure to mark alleged trade secrets produced in litigation as confidential indicates lack of reasonable measures to maintain secrecy).

of trade secret information, once that information is disclosed to or used by others, loses property interest); *Sci. Mach. & Welding, Inc.*, 2022 WL 850409, at *2–3.[16]

On this record, and examining all evidence in the light most favorable to Austen, *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006), no reasonable factfinder could conclude that Austen took "reasonable measures under the circumstances" to keep the information at issue secret, *see* Tex. Civ. Prac. & Rem. Code § 134A.002(6); *Sci. Mach. & Welding, Inc.*, 2022 WL 850409, at *3 (citing *Baxter & Assocs., L.L.C. v. D & D Elevators, Inc.*, No. 05-16-00330-CV, 2017 WL 604043, at *10 (Tex. App.—Dallas Feb. 15, 2017, no pet.)); *Med. RX Servs. LLC v. Georgekutty*, No. 02-21-00017-CV, 2021 WL 6069102, at *8–9 (Tex. App.—Fort Worth Dec. 23, 2021, no pet.). Under this record, the trial court properly granted summary judgment as to this cause of action.

### 3. Tortious Interference with Contract

The elements of tortious interference with an existing contract are (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused plaintiff's injury, and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). Appellees' motion for summary judgment alleged that Austen had produced no evidence that either Spark or Steinig had "(1) willfully and intentionally interfered with

---

[16]Although Appellees raised the enforceability of the Steinig Agreement, they did not raise, and we do not address here, whether failure to address confidentiality of previously known information rendered it illusory. *See Eurecat US, Inc. v. Marklund*, 527 S.W.3d 367, 389 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

a contract[,] (2) that proximately caused [Austen's] injury[,] and (3) that caused actual damages or loss to [Austen]."[17]

As evidence of a contract with which Spark interfered, Austen produced the Steinig Agreement.[18] As evidence of a contract with which Steinig interfered, Austen produced customer agreements signed on behalf of Grapevine Faith Christian School and testimony that Austen had a contract with BISD. Austen also alleges that Steinig's actions, as a sales manager, are imputed to Spark, and so each is also responsible for tortious interference by the other.

To establish liability for interference with a prospective contractual relationship, "the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713

---

[17]Austen asks us to hold that it has raised a genuine issue of material fact as to this claim because it calls into question Steinig's credibility. For this proposition, Austen asserts that we should disregard Steinig's deposition testimony related to harm because Steinig's attorney "attempt[ed] to coach his client during the deposition" by beginning a question with the phrase, "I represent to you." However, the "coaching" question was posed to Steinig by Austen's trial counsel, Scott Dilbeck, not Appellees' trial counsel, Jeffrey Parks. Accordingly, we will decline to entertain Austen's request.

[18]Austen argues in its brief that AMCOM terminated its contract with Austen, demonstrating tortious interference by Appellees with that contract. However, Austen offers no evidence that any act of either Steinig or Spark contributed to the termination of the Austen–AMCOM contract. In fact, Ussery's declaration states, "Austen delivered a letter to AMCOM as well explaining the matter and as a result, AMCOM refused to do any business with Austen or Steinig." Accordingly, Austen's evidence actually demonstrates that its own actions caused the termination, which cannot be the basis of a claim for tortious interference with a contract. *See In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 761–62 (Tex. 2006) (orig. proceeding).

19

(Tex. 2001). Conduct is "independently tortious" if it would violate some other recognized tort duty. *Id.*

As evidence of Spark's and Steinig's tortious interference with Austen's contract with Grapevine Faith, Austen introduced a telephone call from Grapevine Faith to Spark that was transferred to Steinig. In the call, a representative from the school acknowledges that their telephone system is down, and Steinig states that "just tons of [Austen's] customers are calling [Spark]." Steinig then verifies the technical details of Grapevine Faith's telephone system and offers to prepare them a price quote based on their needs.

The only evidence in the record as to the BISD contract is that it remains in effect, that it is prepaid, and that Austen has not offered—and BISD has not requested—a refund or early termination.

Austen claims that Spark tortiously interfered with the Steinig Agreement by contacting Austen's customers. Austen also alleges that both Steinig and Spark interfered with its contracts with Grapevine Faith Christian School and BISD.

The only evidence of proximate cause and damages that Austen points to appears to be the "dissemination of Austen's confidential information, pricing lists, [and] client lists," which it argues "harmed Austen and continues to harm Austen by the mere fact it is still out there being used." This is based on the fact that Steinig, speaking to one of Austen's customers, offered a service price, an amount with which the customer agreed. Here, Austen couches an alleged breach of the Steinig Agreement as a claim for tortious

20

interference. However, a person cannot be said to tortiously interfere with a contract to which he or she is a party. *See Vesta*, 192 S.W.3d at 761. Because Austen has failed to raise a genuine issue of material fact as to this element, the trial court's grant of summary judgment was proper. *See Hansen*, 525 S.W.3d at 690 (citing *Holloway v. Skinner*, 898 S.W.2d 793, 794–96 (Tex. 1995)).

### 4.    Texas Theft Liability Act

Under the TTLA, a person who commits theft under any of several sections of Chapter 31 of the Texas Penal Code is civilly liable for the damages resulting from the theft. Tex. Civ. Prac. & Rem. Code §§ 134.002(2), 134.003.

Appellees alleged that "[t]here is no evidence to support any of these elements." This blanket assertion alone would be insufficient. *See Hansen*, 525 S.W.3d at 695–96. However, the motion went on to allege that "there [was] no evidence that [Spark and Steinig] misappropriated the property with the necessary intent under the Texas Penal Code." Intent is an essential element of a claim under the TTLA because it is an essential element of the offense of theft. *See Coe v. DNOW LP*, 718 S.W.3d 338, 365 (Tex. App.—Houston [14th Dist.] 2025, pet. denied). Thus, the no-evidence motion challenged only the element of "the necessary intent under the Texas Penal Code." *See Hansen*, 525 S.W.3d at 696.

Austen claimed that Spark intentionally deprived it of the right to use a 3CX license it had leased to BISD.[19] However, the only evidence in the record indicates that Austen still owns the license that BISD still leases, although BISD modified the online account to list Spark as the license manager. Austen introduced testimony from Ussery that he had not requested that 3CX remove Spark's name as manager of the license and that he could return Austen's name to the license at any time but did not because the companies were in litigation over the license. The evidence Austen introduced affirmatively demonstrates that neither Spark nor Steinig deprived Austen of possession or ownership of the license, which it still owns, or of the value of the license, which BISD still leases from it. Tex. Civ. Prac. & Rem. Code § 134.002; Tex. Penal Code §§ 31.01(4), 31.03, 31.05.

Because Austen did not introduce evidence that raised a genuine issue of material fact as to the intentional deprivation of any property, the trial court did not err by granting summary judgment as to this cause of action.

Austen failed to carry its burden as to any of the four causes of action dismissed under the no-evidence motion for summary judgment. Accordingly, we affirm the trial court's order granting summary judgment and overrule Austen's first issue.

---

[19]In the trial court, Austen argued a theory that Steinig's deletion of information from a laptop constituted theft under the TTLA. Austen does not brief this theory on appeal, so it is not properly before us. Tex. R. App. P. 38.1(i) ("The [Appellant's] brief must contain a clear and concise argument for the contentions made . . . .").

# III. ATTORNEY'S FEES

Each person who prevails in a suit under the TTLA shall be awarded court costs and reasonable and necessary attorney's fees. Tex. Civ. Prac. & Rem. Code § 134.005(b). This provision applies to both plaintiffs and defendants who prevail. *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 148 (Tex. 2019).

Austen first argues that the award was in error because Appellees were not prevailing parties. However, because we have affirmed the trial court's grant of summary judgment as to this cause of action, an attorney's fee award to Appellees as prevailing parties was proper under the TTLA. *See* Tex. Civ. Prac. & Rem. Code § 134.005(b); *Agar Corp.*, 580 S.W.3d at 148.

Austen then argues that Appellees' attorney-fee evidence was improperly segregated.

Whether attorney's fees need to be segregated is a question of law that we review de novo. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 312 (Tex. 2006); *Prudential Ins. Co. v. Durante*, 443 S.W.3d 499, 513 (Tex. App.—El Paso 2014, pet. denied). But the extent to which claims can or cannot be segregated is a mixed question of law and fact. *See Chapa*, 212 S.W.3d at 313; *Brinson Benefits, Inc. v. Hooper*, 501 S.W.3d 637, 645 (Tex. App.—Dallas 2016, no pet.).

A court's decision as to the amount of attorney's fees awarded is reviewed under a legal-sufficiency standard. *Huey-You v. Huey-You*, No. 02-16-00332-CV, 2017 WL 4053943, at *2 (Tex. App.—Fort Worth 2017, no pet.); *Am. Risk Ins. Co. v. Abousway*,

23

No. 14-13-00124-CV, 2014 WL 2767402, at *5 (Tex. App.—Houston [14th Dist.] June 17, 2014, no pet.); *EMC Mortg. Corp. v. Davis*, 167 S.W.3d 406, 418 (Tex. App.—Austin 2005, pet. denied). Because we review the amount of attorney's fees awarded under a legal-sufficiency standard, if more than a scintilla of evidence supports the award, the challenge must fail. *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003).

Generally, parties seeking recovery of attorney's fees are required to segregate their fees between claims for which attorney's fees are recoverable and claims for which they are not. *See Chapa*, 212 S.W.3d at 311. But there is an exception to this requirement: "when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'inter[t]wined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Id.* (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991)). A common set of underlying facts alone does not relieve a party of the duty to segregate its attorney's fees between recoverable and unrecoverable claims; "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14.

Additionally, where a party is required to segregate its fees, it need not present "more precise proof for attorney's fees than for any other claims or expenses." *Id.* at 314. The party need not present separate time records for each claim. *See id.*; *State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 102 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A party satisfies its burden to segregate its attorney's fees if it submits to the

24

fact finder testimony from its attorney stating the percentage of fees that are recoverable and unrecoverable. *See Chapa*, 212 S.W.3d at 314; *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 202 (Tex. App.—Dallas 2013, pet. denied); *see also Enterprising Gals of Tex., L.L.C. v. Sprehe*, No. 02-17-00063-CV, 2018 WL 3580998, at *3 (Tex. App.—Fort Worth July 26, 2018, no pet.) ("A party satisfies its burden to segregate its attorney's fees if it submits to the fact finder testimony from its attorney stating the percentage of fees that are recoverable and unrecoverable.").

Appellees submitted billing records reflecting the total number of hours their attorneys and staff billed on the case, the tasks each person performed, the amount of time spent performing those tasks, and each person's respective hourly rates. In addition, Appellees' attorney, Jeffrey Parks, submitted an affidavit concerning the incurred fees, the hours for each task, and the reasonableness of the fees. Parks's affidavit stated that the billing dates began when Austen amended its petition to include a charge under the TTLA and that the total billing amount was reduced to 80% to reflect Parks's estimate of the amount of the total billing time that he believed was related to the TTLA claim and to intertwined claims.

The evidence of the amount of attorney's fees and segregation percentage was legally sufficient to support the trial court's award of attorney's fees. *See Chapa*, 212 S.W.3d at 314. Accordingly, we overrule Austen's second issue.

## IV.   CONCLUSION

Having overruled both of Austen's issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: June 4, 2026